## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

| | |
|---|---|
| **Michael Tate, Joseph Shuster, Lyle Evanson** and **John Ayers, individually and on behalf of all other individuals similarly situated**, | Civil No. 09-2076 (MJD/JJG) |
| Plaintiffs, | |
| v. | **REPORT AND RECOMMENDATION** |
| **Restaurant Technologies, Inc., Parthenon Capital LLC, Jeffrey R. Kiesel, John C. Rutherford, Jonathan O. Grad, Zachary F. Sadek, Philip A. Clough,** and **Robert E. Weil,** | |
| Defendants. | |

---

JEANNE J. GRAHAM, United States Magistrate Judge

This matter came before the undersigned on July 12, 2011, on Motion Requesting Court to Find Claims Were Timely as a Result of "Excusable Neglect" and Allowing Participation in Settlement Fund Distribution of Class Member W. Hall Wendel, Jr. Revocable Trust (Doc. No. 175). Timothy D. Kelly, Esq., appeared on behalf of W. Hall Wendel, Jr. Revocable Trust (the "Trust"). Robert C. Moilanen, Esq., appeared on behalf of Plaintiffs Michael Tate, Joseph Shuster, Lyle Evanson and Jack Ayers (collectively, "Plaintiffs" or "Class Representatives").

The Honorable Michael J. Davis, United States Chief District Judge, referred the motion to this Court for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) (Doc. No. 187). For the reasons set forth below, this Court recommends that the motion be granted.

I.      BACKGROUND

      A.      Class Action Litigation

Plaintiffs are minority shareholders of Defendant Restaurant Technologies, Inc. ("RTI"). On July 17, 2009, Plaintiffs on behalf of themselves and all others similarly situated initiated the above-captioned action against Defendants RTI, Parthenon Capital LLC ("Parthenon"), Jeffrey R. Kiesel, John C. Rutherford, Jonathan O. Grad, Zachary F. Sadek, Philip A. Clough and Robert E. Weil (collectively, "Defendants") in the state court of Minnesota.   Shortly thereafter, Defendants removed the action to federal court.   Plaintiffs bring suit against Defendants and certain of RTI's directors and officers for various breaches of fiduciary duty by RTI arising from RTI's recapitalization in June 2009 and certain share issuances and RTI business decisions preceding the recapitalization.

Plaintiffs allege that Parthenon took control of RTI sometime before 2004 and utilized that control to the detriment of other RTI shareholders by, among other things, diverting RTI's equity to itself.   Plaintiffs assert that these events occurred through a number of preferred stock offerings and culminated in a 2009 recapitalization that froze out RTI common shareholders and underpaid certain RTI preferred shareholders.   Plaintiffs also allege that Defendants acted in concert and elevated their own interests above those of other RTI shareholders to whom they owed fiduciary duties.

The stock offerings were proposed to RTI shareholders through a proxy statement in May 2009.  Plaintiffs assert that the proxy materials used in connection with the 2009 recapitalization contained false and misleading statements, omitted to state material facts necessary to make the statements made not misleading and failed to advise properly RTI shareholders of their ability to pursue certain appraisal rights.

Defendants have denied all alleged wrongdoing and contend that their conduct was at all times legal and was in RTI's best interest.  Defendants also contend that without the financial support of Defendant Parthenon and other private equity firms, RTI may not have survived.  Accordingly, Defendants counter that even if a jury was to determine that some act or failure to act took place in connection with the 2009 recapitalization, Plaintiffs suffered no damage given the financial condition of RTI at that time.

The Court has not ruled on the merits of any of the parties' respective claims or defenses.  The case has undergone extensive motion practice including a motion to dismiss, a motion to assert punitive damages, a motion for class certification, a motion for partial summary judgment and several discovery motions.

**B.     Settlement and Settlement Fund Distribution**

In June 2010, the parties engaged in mediation, which occurred over a series of weeks and ultimately resulted in a Stipulation of Settlement.  On September 30, 2010, the Court issued an Order Preliminarily Approving Settlement and Approving Form and Manner of Notice (the "Preliminary Order").  (Doc. No. 150).  The Preliminary Order, in relevant part: (a) certified the class for settlement purposes, including all those individuals and entities which held RTI common stock as of June 12, 2009, with certain exclusions inapplicable here; (b) set the Final Settlement Hearing pursuant to Rule 23(e) of the Federal Rules of Civil Procedure on November 29, 2010; and (c) approved the form and content of the Notice of Proposed Settlement of Class Action and Hearing Regarding Settlement ("Notice") and its attached Claim Form and Release (collectively, "Notice and Proof of Claim").

3

The approved Notice stated, in part:

> If you do not request to be excluded from the Class in the manner specified in Section VIII below, you are a Class Member and will be bound by any judgment entered with respect to the settlement in the Litigation whether or not you submit a Proof of Claim and Release form. ___If you are a Class Member, you need do nothing other than timely file a properly completed Proof of Claim and Release form if you wish to participate in the distribution of the Net Settlement Fund. Attached to this Notice is a Proof of Claim and Release Form with mailing instructions. You must return this Proof of Claim and Release Form by November 12, 2010 to participate in the recovery.___

(Notice and Proof of Claim at 16–17 (emphasis in original).) (Doc. No. 150-1). Similarly, the Claim Form and Release stated, in part: "**YOUR FAILURE TO SUBMIT YOUR CLAIM BY NOVEMBER 12, 2010 WILL SUBJECT YOUR CLAIM TO REJECTION AND PRECLUDE YOUR RECEIVING ANY MONEY IN CONNECTION WITH THE SETTLEMENT OF THIS ACTION. . . .**" (Claim Form and Release at 1 (emphasis in original).) (Doc. No. 150-2).

On November 29, 2010, the Court issued its Final Judgment and Order of Dismissal with Prejudice (the "Final Order") which finally approved, in relevant part: (a) final certification of the class, and (b) the Stipulation of Settlement. (Doc. No. 173). The Final Order also dismissed the class action with prejudice, but retained continuing jurisdiction over certain matters, including the "implementation of the settlement and any award or distribution of the Settlement Fund" and "disposition of the Settlement Fund."

At the time the Trust asserted its claim, no settlement distributions had been made, but the allocation of the settlement fund to common shareholders, like the Trust, had been determined. The Class Administrator and the Class Representatives have since distributed settlement funds to other class members (approximately $8.5 million), but have held back the Trust's share of the settlement fund (approximately $85,000), pending this Court's ruling on the Trust's motion.

4

**C.       Events Giving Rise to the Submission of the Wendel Trust Proof of Claim**

W. Hall Wendel Jr. ("Wendel") is the trustee of the W. Hall Wendel, Jr. Revocable Trust (the "Trust").  However, the Wendel Family Office and its CEO and Business Manager, Deborah A. Farley Cortez ("Cortez"), administer and manage the Trust.  (Trust's Mem. at 5.)  For more than eighteen years, Cortez has been directly and solely responsible for the management and administration of all business, financial, trust, and investment affairs conducted by the Wendel Family Office, including the Trust.  The business, financial, trust, and investment affairs further include receiving, reviewing, and acting upon all communications delivered to the Wendel Family Office concerning any trust or investment managed by the Office, such as the Trust.  (*Id.* at 5–6.)

In or around October 2000, the Trust purchased 17,000 common stock shares of RTI at a cost of about $255,000.00.  (*Id.* at 5.)  Since November 2008, Cortez, on behalf of the Trust, has received only a handful of communications from RTI concerning the Trust's investment.  For example, on December 1, 2008, the Trust received a letter addressed to Wendel from RTI's Chairman stating that despite management's efforts, RTI had not been able to grow EBITDA (that is, earnings before interest, taxes, depreciation and amortization) or value for the common shareholders.  (*Id.* at 6.)

About a year later, on or about August 5, 2009, the Trust allegedly received its last communication from RTI.  In the August 2009 letter, RTI's CEO and Secretary announced an Agreement and Plan of Merger, wherein the common stockholders, like the Trust, could receive cash in exchange for their stock, at the rate of $0.1532 per share, or approximately $2,000.00 for the 17,000 RTI common shares held by the Trust.  Based on the low cash exchange offer, Cortez

concluded that the investment was essentially a loss for the Trust. (*Id.* at 6–7.) Consequently, the Trust rejected the cash exchange offer.

The parties currently dispute whether the Trust received any further communications or correspondence concerning its RTI investment between August 2009 and March 2011. (*See id.* at 7.) This dispute is due mostly to the fact that the Wendel Family Office changed locations during the class action litigation. Before July 2009, the Wendel Family Office was located in Loretto, Minnesota. Thereafter, the Office relocated to Maple Grove, Minnesota. The Trust subsequently filed a standard change of address notification and separately notified each of its vendor and business contacts, such as RTI, of the same. However, Plaintiffs claim that RTI's corporate records and shareholder list never reflected a change in the Wendel Family Office location. (Pls.' Mem. at 5.)

On October 14, 2010, the Claims Administrator sent a Notice and Proof of Claim to the Loretto, Minnesota address, which eventually "bounced back" due to an incorrect recipient address. (*Id.*) After that mailing was returned with the forwarding address, the Claims Administrator re-mailed the documents to the Maple Grove, Minnesota address on October 19, 2010. (*Id.*; Bethke Aff. ¶ 3.) On November 3, 2010, the Claims Administrator mailed a reminder postcard to those who had not submitted a Proof of Claim, including the Trust at its Maple Grove, Minnesota address. (Pls.' Mem. at 3, 5 n.4; Bethke Aff. ¶ 3.) The reminder card advised members that they had to submit their Proofs of Claim by November 12, 2010, and directed members to a website for answers to any questions they might have regarding the settlement. (Pls.' Mem. at 4.)

Despite the fact that the Claims Administrator purportedly mailed the Notice and Proof of Claim (and the subsequent reminder postcard) to the Trust on or about October 14, 2010,

October 19, 2010, and November 3, 2010, the Trust claims that no such notices or reminders were ever delivered to or received by the Wendel Family Office or the Trust.  Likewise, Cortez claims that at that time, she did not have any knowledge of the class action or subsequent settlement.  (Trust's Mem. at 7.)

The Trust alleges that it was first alerted to the class action and potential distribution of settlement funds in March 2011.  Specifically, on or about March 22, 2011, Cortez received a phone call from John Ehlert ("Ehlert"), another RTI investor.  During the phone call, Ehlert told Cortez that he had received a letter concerning his entitlement to settlement proceeds (the "March 2011 Letter").[1]  (*Id.* at 9.)  When Ehlert asked Cortez if she had received the same letter or similar information, Cortez replied that she had not and asked if she could have a copy of the letter.  Ehlert sent the copy.

The March 2011 Letter attempted to resolve any confusion surrounding the settlement and RTI's 2009 recapitalization.  Specifically, the March 2011 Letter notified certain RTI shareholders of their right under the settlement to exchange their old RTI stock and to obtain their share of proceeds arising from the recapitalization.  This letter also directed participating RTI shareholders to complete a "Letter of Transmittal" in order to receive the share proceeds. Lastly, the letter stated that the distribution of settlement funds from the RTI class action had not yet been distributed and probably would not be distributed for "several months."

---

[1] Ehlert also claims that he did not receive notice of the class action until November 2010, when he received the reminder postcard telling him that he should have received certain documents needed to complete a Proof of Claim.  Thereafter, Ehlert responded to the postcard by writing a letter (to an unknown party) and explaining that he had not received the initial documents, which presumably were the original Proof of Claim papers.  (Ehlert Aff. ¶ 7.)

On or about March 24, 2011, the Trust's tax accountant, Thomas LaQua, spoke to Nathan Brennan, an attorney at Anthony Ostlund Baer & Louwagie, P.A. ("AOB"), one of the firms selected as Class Counsel, after receiving a copy of the March 2011 Letter.  Brennan explained the status of the settlement to LaQua and apparently directed him to the class action website, which contained all of the relevant materials relating to the class action and settlement, including the Notice and Proof of Claim.  (Brennan Aff. ¶ 3.)  Brennan also told LaQua that he would get back to him after he finished investigating why the Trust had not received a letter similar to that sent to Ehlert.  (*Id.*)

On or about March 24 or 25, 2011, Brennan spoke with LaQua and told him that the Trust had not received the March 2011 Letter because the letter had been sent to Loretto, Minnesota, instead of the Trust's current address in Maple Grove, Minnesota; thus, the letter "bounced back" to AOB.[2]  (Trust's Mem. at 10.)  The Trust claims that Brennan advised LaQua that the Trust could still participate in the distribution of the settlement funds if it filed a late-dated Proof of Claim form despite the November 12, 2010 claim deadline having past.  (*Id.* at 11; LaQua Aff. ¶ 15.)  Specifically, the Trust claims that Brennan advised that a "technicality" such as the Trust's failure to timely file a claim due to lack of notice would not exclude it from receiving the settlement funds it was entitled to receive.  (LaQua Aff. ¶¶ 14-15.)  Moreover, the Trust claims that Brennan did not convey any sense of urgency when advising LaQua on submitting the Proof of Claim.  (*Id.* ¶ 16.)  The Trust further claims that Brennan advised that no

---

[2] The Class Representatives contend that the March 2011 Letter had been sent to the Loretto, Minnesota address because, while the Claims Administrator had employed the correct address for the Trust, AOB was still using a mailing list from RTI's transfer agent, Wells Fargo, that had listed the old Loretto address.  (Brennan Aff. ¶ 5.)

settlement funds had been distributed, and that it would likely be several months before any settlement funds would be distributed.  (*Id.*)

The Class Representatives counter that Brennan directed the tax accountant to the website containing all settlement materials and advised him to submit the Proof of Claim promptly with a rationale why it was late.  (Pls.' Mem. at 6; Brennan Aff. ¶ 5.)  The Class Representatives also contend that Brennan specifically made "'no promises' that [the Trust's] submission would be considered valid."  (Pls.' Mem. at 6; Brennan Aff. ¶ 5.)

Although Cortez and the Trust's counsel began reviewing the information and forms necessary for submitting a Proof of Claim on or about March 29, 2011, the Proof of Claim was not filed until May 10, 2011.  (Trust's Mem. at 11, 13.)  Most of this delay was due to the Trust's counsel reviewing the voluminous and complex documents associated with the Letter of Transmittal and completing and later returning the Proof of Claim and Letter of Transmittal to the Trust on or about April 28, 2011.  Also, the forms were not submitted until May 10 because Wendel did not execute the forms until early May 2011, as he was traveling out of state.  (*Id.* at 13.)

On May 16, 2011, the Claims Administrator informed the Trust that it was unable to accept the Proof of Claim because it was untimely.  (*Id.*)

Thereafter, the Trust's counsel discussed the denied claim with Class Counsel, but was told that the Trust's claim would remain denied.  The present litigation ensued.  Defendants take no position on the Trust's motion.  (*See* Defs.' Mem. at 1–2.)  (Doc. No. 190).

## II.    DISCUSSION

### A.    Standard for Excusable Neglect

The Court has equitable power to allow late-filed proofs of claim pursuant to Rule 6(b)(1)(B) of the Federal Rules of Civil Procedure. *Clark v. Runyon*, 165 F. Supp. 2d 920, 922 (D. Minn. 2001) (citations omitted). The Court may extend a deadline to file a proof of claim "on motion made after the time has expired if the party failed to act because of excusable neglect." *See* Fed. R. Civ. P. 6(b)(1)(B); *see also Clark*, 165 F. Supp. 2d at 922 ("Courts have often treated requests to accept late-filed or late-cured proofs of claim as motions to extend the time to comply with a court-ordered deadline.").

Pursuant to Rule 6(b)(1)(B), when deciding whether a failure to act is the product of excusable neglect, courts make an equitable determination based upon all relevant circumstances surrounding that failure to act. *Kaubisch v. Weber*, 408 F.3d 540, 543 (8th Cir. 2005). These relevant circumstances include the following: (1) the danger of prejudice to the other party; (2) the length of the delay and its effect on the proceedings; (3) the reason for the delay, including whether the delay was under reasonable control of the moving party; and (4) whether the party seeking the extension acted in good faith. *Jefferson v. Hicks*, 364 Fed. App'x 281, 2010 WL 364223, at *2 (8th Cir. 2010) (quoting *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 394 (1993)).

The Class Representatives would like this Court to adopt a heightened standard for showing excusable neglect, one where the movant must provide actual evidence to prove such behavior. That is, a standard where the movant must provide more than mere assertions and statements to establish excusable neglect. (*See* Pls.' Mem. at 7 (citing *In re Goodwin*, 437 B.R. 844, 849 (B.A.P. 8th Cir. 2010)).) Applying this heightened standard, the Class Representatives

argue that the Trust's motion should be denied because the only purported evidence offered in support of its argument that it did not receive notice of the class action until March 2011 is a single paragraph in Cortez's affidavit stating, "I review all correspondence and communications mailed to the Wendel Family Offices, so if these notices and reminders had been delivered to the Wendel Family Offices, I would have received and reviewed the same, but I did not."  (*See* Cortez Aff. ¶ 12.)

It is true that the *Pioneer* factors do not bear equal weight, as the reason for delay is generally a key factor in the analysis.  *Kurka v. Iowa Cnty., Iowa*, 628 F.3d 953, 959 (8th Cir. 2010) (citation omitted).  However, the Eighth Circuit does not demand a heightened standard of excusable neglect such that a reason for delay equates to the movant providing actual evidence. With this in mind, the Court now turns to the application of the *Pioneer* factors to the present case's facts.

### B.    Application of the *Pioneer* Factors

Evaluating the totality of the circumstances surrounding the delay in this case, the Trust's claim should be permitted.

### 1.    Good Faith and Danger of Prejudice to Non-Moving Parties

While there is no dispute that the Trust filed its claim six months after the filing deadline expired, there has been no suggestion that the filing delay and even the Trust bringing its motion are acts of bad faith.   The Class Representatives were on notice that the Trust was going to file a late claim.  Also, Class Counsel encouraged the Trust to file its Proof of Claim even though the submission deadline had passed.  *Cf. In re Elec. Carbon Prods. Antitrust Litig.*, 622 F. Supp. 2d 144, 160–61 (D.N.J. 2007) (finding claimant's delay in filing claim excusable where claimant

mailed letter to the claim administrator once it became aware of the settlement and the claim administrator advised claimant to gather documentation and file its claim).

Moreover, acceptance of the Trust's untimely Proof of Claim will have minimal prejudice, if any, on Defendants.  There is little dispute that the Trust's delay has minimal effect on RTI, especially when RTI and the remaining Defendants take no position on whether they are prejudiced by the Trust's motion.  Additionally, the Trust admits that a late-filed proof of claim and resulting expansion of a class can be detrimental to a defendant like RTI.  (*See* Trust's Mem. at 15.)  Here, however, no such danger exists.  The settlement funds allocated to the common shareholders have been fixed.  Thus, the addition of one more common shareholder to the settlement class will not affect the amount of settlement funds RTI will pay.

Likewise, permitting the Trust's claim will not materially affect allocation of settlement funds to members of the settlement class.  Because the Trust asserted its claim before the distribution of settlement checks, the Class Representatives and Claims Administrator withheld distributing the Trust's financial interest in the settlement (approximately $85,000) to permit this Court to rule.  *Cf. Welch & Forbes, Inc. v. Cendant Corp.* (*In re Cendant Corp. Prides Litig.*), 233 F.3d 188, 191 (3d Cir. 2000) ("[T]he court retains its traditional equity powers . . . to protect unnamed, but interested persons . . . *[u]ntil the fund created by the settlement is actually distributed*." (emphasis added)).  If the Trust's claim is allowed, the net effect on the settlement class members holding common shares would be about 7 cents per share.

### 2.       Length of Delay and Its Impact on Judicial Proceedings

In addition to the lack of prejudice on Defendants and the class members, the six-month delay has little impact on the judicial proceedings.  *Cf. In re Cendant Corp. Prides Litig.*, 311 F.3d 298 (3d Cir. 2002) (allowing delinquent claim although claim custodian carelessly and

inefficiently handled its responsibilities); *see also In re Orthopedic Bone Screw Prods. Liab. Litig.*, 246 F.3d 315 (3d Cir. 2001) (seven-month delay held excusable); *Chemetron Corp. v. Jones*, 72 F.3d 341 (3d Cir. 1995) (claim two years late could be excusable).   The only judicial proceeding that occurred between the November 12, 2010 claim deadline and May 10, 2011, when the Trust submitted its Proof of Claim, was the final approval of the settlement.   The Class Representatives do not even contend that the final approval of the settlement was adversely affected by the absence of a claim by the Trust.   On November 29, 2010, the Court issued its Final Order, which approved the Stipulation of Settlement and dismissed the class action with prejudice.   Moreover, the time to opt-out of the settlement class has passed.

### 3.   Reason for the Delay

The remaining factor regarding the reason for the Trust's delay in filing its claim demands more discussion.   Excusable neglect is an elastic concept; it is not limited strictly to omissions by circumstances beyond the movant's control.   *Clark*, 165 F. Supp. 2d at 922. Excusable neglect may also encompass inadvertent delays.   *Id.* (citation omitted); *see also Chorosevic v. MetLife Choices*, 600 F.3d 934, 946 (8th Cir. 2010) (stating that excusable neglect "empowers courts to accept, 'where appropriate, late filings caused by inadvertence, mistake, or carelessness, as well as by intervening circumstances beyond the party's control'").

Here, the filing delay was within the Trust's control, but not entirely.   The Trust claims that it missed the November 2011 filing deadline because it never received actual notice of the class action until mid-March 2011.   The common law has long recognized a presumption that an item properly addressed and sent with postage prepaid is received by the addressee.   *Marvin Lumber & Cedar Co. v. Johnson*, 733 F. Supp. 1302, 1306 (D. Minn. 1990) (citing *Nafstad v. Merchant*, 303 Minn. 569, 569, 228 N.W.2d 548, 550 (1975)); *accord In re Cendant Corp.*, 311

F.3d at 304 (citing *Hagner v. United States*, 285 U.S. 427 (1932); *United States v. Bowen*, 414 F.2d 1268 (3d Cir. 1969)).   The presumption arises upon proof that the item was properly addressed, had sufficient postage, and was deposited in the mail.   *Beck v. Somerset Techs., Inc.*, 882 F.2d 993, 996 (5th Cir. 1989).   To invoke the presumption, a party must show "evidence of habit or custom with respect to mailing from the sender's office, coupled with some evidence showing compliance with the custom in the particular instance," which will give rise to a strong inference that the item was properly addressed and mailed.   *Nafstad*, 303 Minn. at 571, 228 N.W.2d at 549; *accord Godfrey v. United States*, 997 F.2d 335, 338 (7th Cir. 1993).

The Class Representatives admit that the Claims Administrator initially sent the Notice and Proof of Claim to the Trust's former address in Loretto, Minnesota.   (*See* Bethke Aff. ¶ 3.) However, despite the fact that the Claims Administrator purportedly mailed the Notice and Proof of Claim (and a subsequent "reminder" postcard) to the Trust's correct address on or about October 19, 2010, and November 3, 2010 (*id.*), the Trust claims that no such notices or reminders were ever delivered or received by the Wendel Family Office or the Trust.

It is likely that the Class Representatives have shown sufficient evidence to establish the presumption of delivery and receipt and that the Trust has not rebutted this presumption.   But, there is no need for the Court to make this finding, as the analysis does not stop here.   Even assuming that the Trust received actual notice, "at the end of the day, the focus must be upon the nature of the neglect."   *See Lowry v. McDonnell Douglas Corp.*, 211 F.3d 457, 463 (8th Cir. 2000).   This is not a case where the filing delay was the result of a unilateral mistake.   Rather, the delay was the product of mistakes and various intervening circumstances between and among the parties.

Once the Trust learned of the class action and potential distribution of settlement funds, it did not file its Proof of Claim until May 2011.  The reason for this delay is that after reading the March 2011 Letter, the Trust made the effort to submit both the Proof of Claim and Letter of Transmittal, an approximately 16-page document, and obtained assistance of counsel to complete the same.  Although Class Counsel sent the March 2011 Letter to resolve any confusion surrounding the settlement and RTI's 2009 recapitalization, the Trust interpreted the letter to mean that it had to submit both a Proof of Claim and Letter of Transmittal in order to participate in the settlement fund distribution.  The Trust now realizes that it could have filed the Proof of Claim sooner if it did not complete the claim simultaneously with the Letter of Transmittal. Given these circumstances, the Court finds that the Trust's explanation for its delayed Proof of Claim filing is reasonable.  *Cf. In re Ins. Brokerage Antitrust Litig. (MDL 1663)*, 374 Fed. App'x 263, 2010 WL 779786, at *2 (3d Cir. 2010) (finding excusable neglect in part because although claimants had actual notice of settlement agreement, they filed their motions "with all possible haste").

Equally important, the Class Representatives have expressed concern that if this Court permits the Trust's rationale for filing a late Proof of Claim, there could be policy implications for the future administration of class action settlements.  However, the Court cannot be fearful that an excusable neglect finding, especially one based on the present facts, will open the floodgates to others seeking the benefits of enlargement of time.  Courts have long held that excusable neglect is proper under a wide variety of facts.  *See, e.g.*, *In re Vitamins Antitrust Class Actions*, 327 F.3d 1207, 1208–09 (D.C. Cir. 2003) (holding that although the delay was within movant's reasonable control, the remaining *Pioneer* factors outweighed the impact of this finding); *In re Cendant Corp. Prides Litig.*, 311 F.3d at 301 (affirming excusable neglect finding,

15

in part, because defendant could not establish prejudice, and even if it could, "the only 'prejudice' [it] would suffer by being forced to pay [the movant] is the 'loss of a windfall'"); *Emmons v. Emmons* (*In re Emmons*), 349 B.R. 780, 790 (Bankr. W.D. Mo. 2006) (concluding a finding of excusable neglect was appropriate, in part, because debtor cited no significant impact on the proceedings before the court that would occur as a result of vacating the default judgment).

Considering all relevant circumstances surrounding the delay, this Court finds that the Trust's belated Proof of Claim was timely due to excusable neglect.

## III.  RECOMMENDATION

Accordingly, based on all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.  The Trust's Motion Requesting Court to Find Claims Were Timely as a Result of "Excusable Neglect" and Allowing Participation in Settlement Fund Distribution of Class Member W. Hall Wendel, Jr. Revocable Trust (Doc. No. 175) is **GRANTED**.

2.  The Trust shall be allowed to participate in the distribution of settlement funds and receive its proportionate share of the settlement proceeds in the above-captioned action, and the Claims Administrator and Class Representatives shall ensure immediate distribution of the same.

Dated: July 25, 2011                                      s/ *Jeanne J. Graham*
                                                                          JEANNE J. GRAHAM
                                                                          United States Magistrate Judge

**NOTICE**

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing and serving specific, written objections by **August 10, 2011**.  A party may respond to the objections within fourteen (14) days after service thereof.  Any objections or responses shall not exceed 3,500 words counted in accordance with Local Rule 7.1.  The District Judge will make a de novo determination of those portions of the Report and Recommendation to which objection is made.  The party making the objections must timely order and file the transcript of the hearing unless the parties stipulate that the District Judge is not required to review a transcript or if the District Judge directs otherwise.